SALTER, J.
M.B. appeals a final administrative order in favor of the Florida Agency for Persons with Disabilities (APD), upholding APD’s denial and reduction of services that had previously been provided M.B. for over five years. We affirm in part and reverse in part.
M.B. is a forty-two year-old woman with spastic cerebral palsy and associated quadriplegia. She has received services from the Florida APD Medicaid Waiver Program for many years, including personal care attendant services in her home for 18 hours per day and assistance from a supported living coach. Although she requires assistance during all waking hours and whenever she moves or changes position, the administrative law judge found, and there is no dispute, that:
M.B.’s physical abilities do not impact her mental abilities. M.B. is bright, in *511 telligent, and assertive and can make life decisions on her own. M.B. has difficulty speaking because of neurological conditions. However, she is able to communicate all her concerns, likes, and dislikes. Due to her cerebral palsy, she does have difficulty pronouncing all words, but one can understand her. M.B. has a bachelor’s degree in social work.
M.B. lives alone in her own apartment and values her privacy. The record indicates that she usually slept about four of the six hours that personal care attendants were not in the apartment to assist her (under her supported living plan in place through 2007). A supported living coach helps M.B. with her correspondence, phone calls, banking, and other paperwork.
In mid-2007, APD’s third-party vendor “Maximus” conducted a review of M.B.’s service plan.[1] Maximus denied or reduced three categories of service and supplies previously provided to M.B., and M.B.’s administrative appeals from these determinations[2] were largely unsuccessful: (1) APD reduced M.B.’s in-home personal care attendant services from 18 hours per day (paid at rates of $12.50 per hour during the week and $11.00 per hour on weekends) to a daily rate of $129 promulgated for 24-hour “live-in” support, plus three hours of care per day at hourly rates to assist with transition to the new arrangement; (2) APD denied M.B. continued reimbursement for a personal emergency response system; and (3) APD denied M.B. certain medically-prescribed “consumable medical goods,” principally artificial tears to prevent corneal ulcerations.
As the administrative law judge correctly acknowledged, APD had the burden of proving by a preponderance of the evidence that these three categories of services, though previously provided, should be reduced or eliminated. Wiggins v. Fla. Dep’t. of Children & Families, 919 So.2d 619 (Fla. 1st DCA 2006); Fla. Admin. Code R. 65-2.060(1).

Personal Care Attendant Services

APD’s coverage and limitations rules are detailed in a “Florida Medicaid Developmental Disabilities Waiver Services Coverage and Limitations Handbook” that is updated from time to time and is referred to as the “Waiver Handbook.” The Waiver Handbook has been adopted as an administrative rule under Florida Administrative Code Rule 59G-13.080.
The Waiver Handbook specifies that an “in-home live in daily rate” will apply to in-home support services if more than eight hours a day are required. During the applicable period, the approved hourly rate for an in-home support or personal care assistant was $15.66 per hour, while the in-home live in daily rate was $129 per day.[3] Although M.B. has been able to obtain hourly care for $11 to $12.50 per hour, the record does not disclose any list of vendors or attendants who would agree to live in M.B.’s apartment and be on call eighteen or twenty-four hours per day for $129 per *512 day. Also, the in-home daily rate does not appear to vary with regional differences in cost of living in the different parts of Florida.
Additionally, M.B. has argued that she does not want her support attendants to be roommates; she values her privacy during the hours her attendants are not in the apartment assisting her. One of the primary goals of APD and the Medicaid Waiver program is the avoidance or mitigation of “institutionalization,” and APD genuinely strives to encourage independent living when practicable.
The administrative law judge found that APD had carried its burden to justify the change from 18 hours per day of personal care assistance at the hourly rate to the in-home daily rate. APD had also agreed to allow up to three additional hours per day at hourly rates to assist in transition to the new arrangement, and this was not disturbed. Financially, this left M.B. with a budget of between $162 and $176 per day (depending on the hourly rates billed by the personal care attendants, and whether those rates fell below the allowable maximum rate), versus her prior budget of $198 (weekends) and $225 per day (weekdays).
APD did not, and apparently does not now, dispute the medical necessity of eighteen to twenty-four hour-per-day personal care assistance for M.B.; the change proposed by Maximus based on the Waiver Handbook actually increased the covered hours from eighteen to twenty-four per day by requiring M.B. to take on a roommate who would (in theory) also be a personal care attendant. As is so often the case, the Waiver Handbook’s limitation is based on dollars and cents, and on the need to lower the daily cost of the requisite care. It is not based on any finding that M.B. needed a reduced number of hours of personal care assistance.
M.B. argues that APD’s proposed imposition of the Waiver Handbook limitation and the in-home daily rate is an impermissible change in policy without the required adoption of a rule, citing Courts v. Agency for Health Care Administration, 965 So.2d 154 (Fla. 1st DCA 2007). M.B. also contends that an agency may not simply “change its mind” or implement a “radical turnabout from its prior interpretations and practices,” relying upon Cleveland Clinic Florida Hospital v. Agency for Health Care Administration, 679 So.2d 1237, 1239 (Fla. 1st DCA 1996). In this case, however, the Waiver Handbook was in effect and was a binding rule well before APD and Maximus reviewed MJB.’s service plan in 2007. Concepts of estoppel and “regulatory certainty” are inapplicable on this record. The benefits in question here are subject to very detailed rules and limitations, and there is no vested right to continue receiving services that were not actually authorized.
Accordingly, we affirm the final order’s determination that APD was required to use the live-in daily rate rather than an hourly rate for M.B.’s service plan. APD supplemented that rate with an authorization for up to three hours per day of additional personal care assistance for M.B. One part of the Waiver Handbook provides authorization for additional hours above the daily live-in rate if the recipient has “intense behavioral challenges” or is recovering from a temporary “medical condition, procedure, or surgery.” Another section allows greater latitude, however:
When periodic additional staff assistance is required for in-home live in services, an in-home hourly support service may be billed for up to six hours a day in addition to the live in support if approved by the APD Area Office with concurrence from the APD Central Office.
*513 In M.B.’s case, APD did not provide evidence that M.B. could obtain in-home live in services at the specified daily rate. M.B. provided evidence that with the daily rate and six[4] hours per day of additional personal care assistance, she could obtain adequate coverage. We therefore reverse that portion of the final order approving APD’s authorization of three hours per day of additional personal care assistance and remand with instructions to increase this to six hours per day.

Personal Emergency Response System

APD’s decision to eliminate reimbursement for M.B.’s emergency “call button” system is based on the assumption that M.B. would have twenty-four hour live-in support services. As noted, this assumption is something of a “legal fiction” in the sense that no one has been identified who would actually provide round-the-clock services at the allowed daily rate, and no one has explained how a single attendant could provide the services and live in the apartment with M.B. 168 hours per week. It is more reasonable to assume that multiple attendants would have to provide the daily services, with only one of them actually living in the apartment.
M.B.’s quadriplegia, her need for assistance with so many activities of daily living,[5] and APD’s inability to assure twenty-four hour-per-day, seven days a week attendant coverage, all combine to make it self-evident that M.B. needs a personal emergency response system. The Waiver Handbook limitations provide:
A personal emergency response system is limited to those recipient’s [sic] who live alone, or who are alone for significant parts of the day, and have no regular caregiver for extended periods of time, and otherwise require extensive routine supervision.
Because M.B. and her counsel have made it clear that they intend to use the available APD reimbursements to cobble together a care plan and attendant schedule that will come as close as possible to the previous 18 hour per day coverage, and because that intention is plainly consistent with APD’s overarching mandate to foster independent living to the extent practicable, APD did not carry its burden to prove by a preponderance of the evidence that the emergency response system should be eliminated from M.B.’s service plan. We reverse on this point, finding that the record in this case shows that M.B. will continue to live alone, will be without a caregiver for extended periods of time (generally at night), and regularly requires extensive routine supervision.

Consumable Medical Supplies

The administrative law judge concluded that the record required her to uphold APD’s disallowance of the “artificial tears” (products known as Visine, Hy-potears, and Celluvisc), supplies previously included and reimbursed as part of M.B.’s service plan. The Waiver Handbook limitation regarding consumable medical supplies states:
A prescription submitted for supplies, diets, over-the-counter medications, vitamins, herbs, etc., which has general utility or is generally available to the gener *514 al population without a prescription, does not change the character of the item for purposes of coverage in this category. For example, a physical therapist, occupational therapist or physician recommending or prescribing items like Tylenol, Ginkgo Biloba, vitamins, gluten-free foods, cotton balls or Q-tips, does not convert that item from general utility items to consumable medical supplies covered under the DD waiver. Items covered in this category generally include only those items that are specifically designed for a medical purpose, and are not used by the general public or other general utility uses. It is the general character and not specific use of the item that governs for purposes of coverage under this category.
The Waiver Handbook also identifies a number of categories of consumable medical supplies that are covered even though they are “generally available to the general population without a prescription,” such as diapers, disposable gloves, hearing aid batteries, and other items obviously necessary for use in providing health care to a disabled recipient of APD assistance. The Waiver Handbook explains that other such items may be approved through “exception” by APD:
To request an exception, a physician must prescribe the item. The statement from the physician must delineate how the item is medically necessary, how it is directly related to the recipient’s developmental disability, and without which the recipient cannot continue to reside in the community or in his [sic] current placement. Items specifically excluded in this handbook will not be approved through exception.
In this case, M.B.’s physician’s prescription dated May 9, 2007, was admitted into evidence. The prescription, which is almost entirely legible, states:
[M.B.] suffers from chronic corneal disease as a direct result of her spastic [illegible word] cerebral palsy. She must have continual, permanent, artificial tears and lubricants to prevent corneal ulcerations.
Additionally, neither “artificial tears” nor the three products requested are “specifically excluded” in the Waiver Handbook. It does not require a medical degree to appreciate that corneal ulcerations are painful, debilitating, and worthy of an immediate medical intervention. This being so, corneal ulcerations would jeopardize M.B.’s ability to live in her apartment. M.B.’s physician and the prescription established the other requirements for an exception to the “general utility items” classification — medical necessity and the relationship of the treatment to her underlying diagnosis. The administrative law judge’s denial of M.B.’s request for the artificial tears and lubricants as consumable medical supplies is therefore reversed.

Conclusion

We recognize that APD’s provision of services to persons with developmental disabilities is limited by the resources committed to those services and by the constraints established with the force of administrative rule in the Waiver Handbook. The parties and their counsel in this case are to be congratulated on the care and professionalism[6] exhibited in the record and in their presentations to this Court.
We affirm the final administrative order under review insofar as it substitutes the *515 daily live-in rate for personal care attendants of $129 per day versus the previously-approved 18 hours per day at approved hourly rates, and insofar as it approves M.B.’s request for supported living coach services; we reverse the previously-allowed three hours per day of “additional in-home supports above the live-in rate,” and remand for an allowance of six additional in-home support hours per day; and we reverse the disallowance of M.B.’s personal emergency response system and artificial tears.
Reversed and remanded for further proceedings consistent with this opinion.

. Maximus reviews high-dollar annual service plans for participants in the Medicaid Waiver Program. The authorization reviewers working for Maximus are typically skilled and experienced service providers themselves.

. Other modifications to M.B.'s service plan have been adjusted to the parties’ satisfaction and are not a part of this appeal. Modifications to M.B.'s plan for 2008 are also on appeal to this Court as our Case No. 3D09-962 (not consolidated). As acknowledged by counsel for the parties during argument, the rulings in this case should assist the parties in attempting to resolve the other case.

.The in-home live in daily rate ascribes an unspecified value to the occupancy costs saved by an attendant who lives with the APD client.

. During the service plan year, the Waiver Handbook "additional staff assistance” authorized in this section was reduced from eight hours per day to six hours per day.

. As the administrative law judge found, "M.B. needs assistance to lift, transfer, bathe, dress, and toileting,” and M.B. has "severe scoliosis and uncontrolled muscular movements that are generalized throughout her body.” None of this subtracts from M.B.'s remarkable accomplishments — her physical limitations simply must be acknowledged in assessing her need for a personal emergency response system.

. Counsel for M.B. is a cousin of hers who has provided extensive and excellent representation without charge. Counsel for APD provided exemplary representation to his client, but also prefaced his legal arguments with an acknowledgment of concern for M.B.'s disabilities and respect for her accomplishments.